**CENTERIOR SERVICE COMPANY, et al., Plaintiffs,**

v.

**ACME SCRAP IRON & METAL, et al., Defendants. and cases consolidated therewith**

**No. 1:94 CV 1588.**

United States District Court, N.D. Ohio, Eastern Division.

May 1, 2000.

---

Thomas M. Downs, Swidler Berlin Shereff Friedman, Washington, DC, for plaintiff.

Carter E. Strang, Arter & Hadden, Cleveland, for defendant Atlantic Richfield.

Mary M. Bittence, Baker & Hostetler, Cleveland, for defendant Shell Oil.

### Memorandum of Opinion and Order

GAUGHAN, District Judge.

### Introduction

This matter is before the Court upon defendant Atlantic Richfield Company's Motion for Summary Judgment (Doc. 1177) and defendant Shell Oil Company's Motion for Summary Judgment (Doc. 1232). This is a CERCLA[1] action, filed by plaintiffs against numerous defendants arising out of costs incurred in the cleaning of a hazardous waste disposal site following the issuance of a unilateral Administrative Order to plaintiffs by the United States Environmental Protection Agency (EPA) pursuant to § 106(a) of CERCLA. These defendants seek summary judgment on the basis that they are not liable as "arrangers." For the following reasons, both Motions are GRANTED.

### Facts

On interlocutory appeal of this case the Sixth Circuit found the facts in this case to be undisputed:

> From approximately 1938 until 1990, the Huth Oil Services Company operated a waste oil reclamation facility at the Huth Oil Site. The site was owned by plaintiff Ashland Oil Incorporated from 1964 until 1981, [FN1] when Huth Oil purchased the property from Ashland. The site contained approximately 33 oil storage tanks with a 992,000 gallon storage capacity. Numerous companies deposited waste oil at the site during its more than 40 years of operation.
>
> FN1. Prior to 1964, Huth Oil leased the property from the Columbia Refining Company.
>
> Between 1983 and 1989, the United States Environmental Protection Agency ('EPA') and the Ohio Environmental Protection Agency inspected the site,

and on several occasions found that the storage tanks and saturated soils at the site were contaminated with hazardous substances, mainly poly chlorinated biphenyls. The EPA also noted that the site was in a dilapidated condition, that its oil tanks were corroded, and that unauthorized access to the site was possible through gaps in the fence surrounding it. Subsequently, after an investigation, the EPA identified four [potentially responsible parties, hereafter PRPs] that played a hand in the poor conditions of the site: (1) Ashland Oil, the current owner/operator of the site; (2) Huth Oil, a previous owner; (3) Cleveland Electric Illuminating Co.; [FN2] and (4) plaintiff General Electric Company. The EPA found that the latter two parties had each arranged for disposal of hazardous substances at the site.

> FN2. Plaintiff Centerior Service Company is the parent corporation for the Cleveland Electric Illuminating Company.
>
> On October 5, 1990, based on the above findings, the EPA issued a unilateral Administrative Order to the plaintiffs [Centerior Service Co., General Electric Co. and Ashland Oil Inc.] under CERCLA § 106, which required the plaintiffs to undertake and complete an emergency cleanup of the site... To this end, the plaintiffs assert that they incurred approximately $9.5 million in costs relating to the cleanup required by the § 106 order... After beginning the cleanup efforts, the plaintiffs conducted their own investigation to identify other potentially responsible parties for the site contamination. The plaintiffs identified approximately 250 parties that had arranged for the disposal of waste oil and other hazardous substances at the site. At no point, however, did the plaintiffs contest their status as PRPs, assert de-

---

1. Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601–9675.

fenses to liability under § 107(a), or seek reimbursement for their response costs from the government under CERCLA § 106(b)...

[On August 4, 1994], the plaintiffs filed five one-count claims for relief against more than 125 defendants seeking to recover their cleanup costs from these parties under § 107(a) of CERCLA, and asserting that the defendants were jointly and severally liable for the costs...

On August 5, 1995, the cases were consolidated for the purposes of discovery and pre-trial proceedings...

*Centerior Service Company v. Acme Scrap Iron & Metal, et al.*, 153 F.3d 344, 345–347 (6th Cir.1998).

Defendants Shell Oil Company and Atlantic Richfield Company have now moved for summary judgment arguing that they are not liable for having arranged for disposal.

### Standard of Review

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir.1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (citing Fed.R.Civ.P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial. If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir.1995) (citation omitted); *see also United States v. Hodges X–Ray, Inc.*, 759 F.2d 557, 562 (6th Cir.1985). However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548). Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995) (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citation omitted).

### Discussion

The Sixth Circuit stated:

CERCLA is the primary statutory means by which harmful or potentially harmful hazardous waste disposal sites are remediated. The statute grants the EPA broad enforcement powers and options. For example, the EPA may on its own initiate response actions to clean up a hazardous waste site using monies from the Hazardous Substances Superfund... and then recover its response costs from PRPs [potentially responsible parties]. It may also require the private PRPs to themselves undertake response actions...

Once a site has been cleaned up, CERCLA provides two causes of action for parties to recover the response costs incurred by the cleanup effort: joint and several cost recovery actions governed exclusively by § 107(a), *see* 42 U.S.C. § 9607(a), and contribution actions as set forth in § 113(f). *See id.* § 9613(f)(1)...

*Centerior Service Company,* 153 F.3d at 347.

 Parties seeking contribution under § 113(f) must look to § 107 to establish the basis and elements of the liability of defendants. *Id.* As such, "to establish a prima facie case for cost recovery under § 107(a), a plaintiff must prove four elements: (1) the site is a 'facility'; (2) a release or threatened release of hazardous substance has occurred; (3) the release has caused the plaintiff to incur 'necessary costs of response'; and (4) the defendant falls within one of the four categories of PRPs." *Id.* (citations omitted), *Kalamazoo River Study Group v. Rockwell International Corp.,* 171 F.3d 1065 (6th Cir.1999).

There are four categories of PRPs: (1) the current owner or operator of a waste facility; (2) any previous owner or operator during any time in which hazardous substances were disposed at a waste facility; (3) any person who arranged for disposal or treatment of hazardous substances at the waste facility; and (4) any person who transported hazardous substances to a waste facility. *See*

§ 107(a)(1)-(4) and *Centerior Service Company, supra.*

Defendants herein allegedly arranged for disposal or treatment of hazardous substances at the waste facility. The relevant CERCLA provision states:

Notwithstanding any other provision or rule of law, and subject only to defenses set forth in subsection (b) of this section-...

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances,... shall be liable...

42 U.S.C. § 9607(a). In *United States v. Cello–Foil Products, Inc.,* 100 F.3d 1227 (6th Cir.1996), the Sixth Circuit stated:

CERCLA does not define the phrase 'arrange for.' ... We conclude that the requisite inquiry is whether the party intended to enter into a transaction that included an 'arrangement for' the disposal of hazardous substances. The intent need not be proven by direct evidence, but can be inferred from the totality of the circumstances.

\* \* \* \* \* \*

Therefore, in the absence of a contract or agreement, a court must look to the totality of the circumstances, including any 'affirmative acts to dispose,' to determine whether the defendants intended to enter into an arrangement for disposal.

*See also Carter–Jones Lumber v. Dixie Distributing,* 166 F.3d 840 (6th Cir.1999) (citing the same).

### (1) Atlantic Richfield (ARCO)

Defendant Atlantic Richfield Company (hereafter, ARCO) argues that it did not own the service stations identified by plaintiff as having arranged for the disposal of waste oil at the Site or that it leased them to independent dealers and, in either case, it did not control the day-to-day activities of the stations.

ARCO names seven ARCO brand service stations which it asserts plaintiff has identified as stations which have arranged for the disposal of waste oil. ARCO submits two affidavits of Robert Fidler, its district sales manager, who avers that the named stations were leased to independent contractors or independently owned at the time alleged waste oil pick ups were made. (ARCO Exs. 1 and 6). ARCO asserts that lessors are not liable for the lessee's waste disposal activities under CERCLA. *General Electric Company v. AAMCO Transmissions, Inc.*, 962 F.2d 281 (2nd Cir.1992) ("oil companies [are] not 'arrangers' of disposal of their services station tenants' waste oil and, therefore, [are] not liable on that basis.")

Plaintiffs do not dispute that an oil company is not liable as an arranger under CERCLA for wastes generated by an independent dealer but assert that facilities other than the ones named by ARCO in its Motion were not addressed by ARCO. Plaintiffs identify several facilities which it states ARCO has not denied owning or operating. Additionally, plaintiffs assert that ARCO fails to identify the entities that did operate or control the facilities during the relevant times which ARCO denies owning. Furthermore, plaintiffs assert that Fidler's affidavit fails to state that ARCO never operated any of the subject facilities during the time the Huth site operated as a disposal facility (i.e., 1938 to 1990) and/or that it never sent waste to the Site. Plaintiffs assert, "Absent from ARCO's Motion is sworn testimony that neither ARCO nor any of its predecessors... ever operated or otherwise controlled any of the ARCO stations identified in the case, or any other facility from which waste was sent to the Huth Site during its years of operation [1938–1990]." (brief at 8).

Plaintiffs argue that it has sought through interrogatories and document requests information regarding whether and for what time period ARCO operated or controlled any facility from which waste was or may have been disposed of at the Site and identification of the entities that did operate or control the ARCO facilities during the relevant periods. Plaintiffs argue that ARCO's Motion for Summary Judgment should be denied until plaintiffs have an opportunity to obtain this discovery. Plaintiffs assert that their discovery requests have been outstanding for three years and that despite the extension of time to September 20, 1999 within which ARCO was to respond, ARCO has not served its responses.

For the following reasons, ARCO's Motion is granted.

First, it is plaintiffs' burden "to set forth specific facts showing that there is a genuine issue for trial." *Anderson, supra.* Plaintiffs' burden is not satisfied by pointing to an absence of evidence supporting defendant's Motion. Thus, while plaintiffs contend that ARCO does not submit *affirmative evidence* that it did not operate the facilities which ARCO states were independently owned, such a contention does not defeat summary judgment where ARCO has submitted affidavit evidence that these facilities were independently operated. Second, on November 24, 1999, ARCO filed its Addendum to Reply in support of its Motion for Summary Judgment stating that it had served its responses to plaintiffs' discovery (interrogatories and requests for production). It does not appear from the docket that plaintiffs have filed any further response. Therefore, plaintiffs may not rest on their assertion that ARCO has failed to comply with discovery. Third, for the following reasons, the Court agrees with ARCO that

plaintiffs' evidence fails to create an issue of fact.

Plaintiffs assert that ARCO "fails to address facilities about which plaintiffs have obtained evidence regarding the sale of waste to Huth." (brief at 5). Plaintiffs list three facilities.

First, plaintiffs name "Swanson Bros. ARCO... for which plaintiffs presently have at least one pick up ticket.[2]" (*Id.*). In support, plaintiffs point to "Bates No. ACTN. 00352." Included with various documents submitted as plaintiffs' Ex. D is a document bearing this number. The document is a copy of a receipt dated 1983 from Action Oil Company naming "Swanson Bros. ARCO" and stating "150 gal. @ .23 $34.50." Plaintiffs do not identify any affidavit or deposition testimony which incorporates this receipt. Therefore, the Court does not find it to be sufficient evidence to show that Swanson Bros. arranged for the disposal of waste oil at the Site.

Second, plaintiffs name "Turney ARCO," pointing to "Bates No. 2149." A review of the various papers attached with plaintiffs' Exhibit D fails to reveal a document containing this number.

Third, plaintiffs name Facilities referred to in the Consent Decree, App. F, 'Laskin Non De Minimus and De Minimis Settlors,' *U.S. v. Alvin Laskin,* [1989 WL 140230] Northern District of Ohio, Eastern District, Case No. C–84–2035Y, [Feb. 27, 1989] September 20, 1989, including the following facilities whose waste oil was transshipped to the Huth Site: ARCO..., ARCO Erie..., ARCO Station..., Church's ARCO... and Sal's ARCO. (brief at 5–6). Plaintiffs do not explain what *U.S. v. Alvin Laskin* is or its relevance herein. Nor do plaintiffs attach a copy of the consent decree but refer the court to what appears to be a computer database which the Court was unable to

access with the information provided. In this regard, plaintiffs also refer the Court to "statements of Alvin Laskin, dated November 18, 1999, that 'my largest customer for used waste oil was Huth Oil Company' (Bates No. 1635)." However, a review of the various papers attached with plaintiffs' Exhibit D fails to reveal a document containing this number or any Laskin statements.

Therefore, plaintiff's assertion that ARCO fails to address its relationship to these other facilities fails to create an issue of fact.

■ Finally, in plaintiffs' *conclusion* paragraph, they merely state that summary judgment is not warranted, "Given the circumstances of this case, including the site nexus deposition testimony and documentary evidence collected to date by plaintiffs that implicate, if not establish, ARCO's liability (*See* attached Exhibit D)..." (brief at 8). Aside from failing to explain what the "site nexus deposition testimony and documentary evidence collected to date" is, plaintiffs do not attempt to identify any specific testimony or documentation submitted in the collection of materials labeled as Exhibit D. Of course, "A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989). While the nonmoving party is not obligated to cite specific page numbers, he should "point out the location of... the designated portions of the record [which] must be presented with enough specificity that the district court can readily identify facts upon which the nonmoving party relies..." *Id.* Plaintiffs herein make no attempt to identify what portions of Exhibit D create an issue of fact. Never-

---

**2.** Although not clarified by plaintiffs, "pick up ticket" apparently signifies that the service station arranged to have waste oil picked up by Huth for purposes of disposing of it.

theless, as ARCO responds to this evidence, the Court will address it.

Plaintiffs submit portions of "interview reports" of former Huth Oil employees who purportedly told the interviewers information regarding waste oil. ARCO objects to the statements as improper Rule 56 evidence. Indeed, they are incomplete reports and not verified in any way. Plaintiffs fail to demonstrate that the statements are incorporated by way of affidavit or deposition. Thus, they have not been considered.

Plaintiffs also submit portions of various deposition transcripts (with no mention of who the deponents are in relation to this lawsuit). In the portion of the deposition of Lucille Gravina submitted[3], the deponent was told that she would be given names of companies and asked whether she recalled any business relationship with Huth. When ARCO was mentioned, she testified, "That sounds familiar to me." She was asked, "Familiar in what way?" She responded, "For picking up waste products." In reply, ARCO points to other portions of her testimony wherein she had no real basis for her recollection but states, "I just remember George Huth picking up waste product possibly from there." (ARCO Ex. C). This type of possibility is not sufficient to create an issue of fact for trial.

In the portion of the deposition of Joyce Nichols[4] submitted by plaintiffs, Nichols was asked to identify from a document listing names of companies which ones were waste oil customers of Huth Oil. She affirmatively identifies, among others, "Turney Oak Arco." Plaintiffs do not attempt to explain or identify this document or point to evidence as to whether Turney Oak was operated by ARCO. In reply, ARCO points out that the document also references a "Cobbledick Buick" (depo. at 39). ARCO presents evidence that this entity did not come into existence until 1976. (ARCO Ex. F). ARCO then presents affidavit testimony that Turney Oak has been independently operated since 1974. Therefore, this Court agrees with ARCO that plaintiffs have not shown that as of the date of the document, when Turney Oak was allegedly a waste oil customer of Huth Oil, that ARCO operated this station.

Finally, plaintiffs submit portions of deposition testimony of Carl Starr and Kurt Tenerove, who ARCO identifies as former waste oil drivers for Huth and Action Oil. Starr testifies that he picked up waste oil from ARCO gas stations. He could not identify the stations. As ARCO points out, Starr testifies that he did not know whether the stations were operated by ARCO or independently operated. (ARCO Ex. G at 75–76). Tenerove also testifies that he had no knowledge as to whether the ARCO stations were independently operated: "I don't know whether they're company or independent." (depo. at 218). Thus, the drivers' testimony fails to create an issue of fact that ARCO owned or operated stations which arranged for disposal of waste oil at the Site.

For these reasons, plaintiffs' proffered evidence fails to create an issue of fact. Therefore, ARCO's Motion for Summary Judgment is granted as plaintiffs have failed to demonstrate that there is an issue for trial as to whether ARCO arranged for the disposal of waste oil at the Site.

### (2) Shell Oil

Shell Oil (hereafter, Shell) argues that it cannot be held liable for arranging for disposal of waste oil at the Site. As explained in more detail below, Shell argues that the service stations identified by plaintiffs as having generated waste oil were operated by independent dealers and not Shell, there is no evidence that Shell ever contracted or otherwise arranged for wastes to be transported to and disposed

---

3. ARCO states in its reply brief that Gravina was a bookkeeper for Huth Oil.

4. She was apparently another former Huth Oil bookkeeper.

at the Site from the West Third Street Facility identified by plaintiffs and it never owned the Oil City Facility identified by plaintiffs and, therefore, did not arrange for wastes to be transported from that facility and disposed at the Site.

### (a) the service stations

Shell asserts, as did ARCO, that the Second Circuit and one district court have concluded that oil companies are not liable as arrangers for wastes generated by a service station of an independent dealer which leased the station from the oil company. *General Electric Company v. AAMCO Transmissions, Inc.,* 962 F.2d 281 (2nd Cir.1992) and *United States v. Arrowhead Refining Co.,* 829 F.Supp. 1078 (D.Minn.1992). As such, Shell contends that independent dealers controlled the operations of the Shell brand service stations identified by plaintiffs as generating the waste oil. Shell asserts that plaintiffs have identified these stations located in Cleveland, Elyria, Lorain, Mansfield, Akron, Dayton, Canton and New Philadelphia during the time period of 1951 to 1962. Shell submits the affidavit of Anthony Nolte who avers, "Based on my knowledge and review of available records regarding stations located in these cities during this time frame, only dealer-operated stations were identified." (Shell Ex. 1). Shell asserts that this is supported by the deposition testimony of Todd McClead, a driver for Action Oil, one of the plaintiffs herein, and William Miller, a driver for Huth Oil. McClead testified, "All the Shell stations that were service stations back then were all independent around here." (Ex. 6 at 96). Miller testified that the Shell stations were "dealer-owned" rather than "company stations." (Ex. 7 at 88). Nolte avers, "Dealers . . . are independent businessmen and businesswomen who own and control their own operations and facilities, including the ownership and control of the generation, management, transport, and disposal of the waste oil from their facilities." (Nolte aff.) Accordingly, Shell contends

that no evidence exists to show that it assumed, or had the authority or obligation to assume responsibility, for the waste oil generated by the independent dealers.

Plaintiffs contend there are disputed facts on this issue as evidenced by the contradictions in Shell's own affidavits. Plaintiffs assert that despite Nolte's averment that only dealer-operated stations were at the cities named during the years 1951 to 1962, the affidavits offered by Shell of James Burkett and Thomas Stepp concede that a Dayton, Ohio Shell station was operated by Shell during this time frame and that Shell conducted and controlled the motor oil change operations there. Plaintiffs assert that these affiants fail to state where the waste oil from this facility was disposed.

In its reply, Shell points out that Burkett avers that plaintiffs did not identify this station as being at issue in this case.

James Burkett is Shell's "Manager–Salary Stations, Head Office." [5] Burkett avers that with the exception of three " 'conventional' salary stations" Shell has not conducted oil change operations at its salary service stations. One of these salary stations which had the ability to conduct oil changes is located in Dayton, Ohio at the intersection of Far Hills and Stroop. He avers that plaintiffs have not identified these three conventional salary stations as being at issue in this case. (Burkett aff.). Stepp, Shell's "Manager–Business Marketing–Jobber Business," also avers that none of the stations in Ohio generally between 1950 and 1970 have been conventional type company-owned/operated stations with the ability to change oil with the exception of the station in Dayton at the location identified by Burkett. (Stepp aff.).

Because plaintiffs fail to point to evidence contradicting this affidavit testimony that the Dayton station was not identified by plaintiffs as having arranged to dispose of its waste oil at the Site, they have not

---

**5.** Thomas Stepp defines "salary" as "company owned and operated." (Stepp aff.).

demonstrated that there is a disputed issue of fact in this regard.

Additionally, plaintiffs argue that Shell's evidence "regarding independent dealers does not establish that others controlled *all* of the Shell stations and motor oil changing operations heretofore implicated in the case by several witnesses and documents." (brief at 2). Plaintiffs refer the Court to their Exhibit A attached to the brief, "*See* nexus information attached hereto as Exhibit A." (*Id.* at footnote 2). However, Exhibit A is largely a collection of unsworn and unauthenticated documents consisting of a "signed statement" of Carl Stutzman who refused to sign the statement, an incomplete document entitled, "Estimated Volumes–Laskin Oil," a Huth Oil document listing names of companies for oil pick up and "waste crank case oil," portions of interview reports, copies of ledgers, Action Oil driver logs and Action Oil receipts. Exhibit A also contains portions of deposition transcripts. Because plaintiffs fail to identify which of this evidence, even if admissible, or what portions of the depositions show that Shell owned or operated some of the stations, plaintiffs do not satisfy their burden.

■ Plaintiffs also argue that "certain other Shell facilities named and implicated by evidence collected to date have *not* been addressed by Shell." However, plaintiffs do not point to affirmative evidence identifying other facilities. In a summary judgment proceeding, the moving party need not disprove the elements of plaintiffs' claim nor submit affirmative evidence that no factual dispute exists but, rather, need only point to an absence of a genuine issue of material fact. *Celotex, supra.*

Furthermore, plaintiffs assert that Shell has failed to respond to outstanding interrogatories and document requests propounded over three years ago (i.e., in October 1996) requesting information regarding whether and for what time period Shell operated or controlled any facility in Ohio from which waste was or may have been disposed of at the Site. Plaintiffs contend that on August 4, 1999, pursuant to the Case Management Order, it served Shell with a Notice of Outstanding Discovery Requests which stated that the responses must be served within 45 days (pltfs.Ex. B) and that no responses have been served. Shell replies that since 1995 it has provided plaintiffs with sworn affidavits and relevant case law showing that it is not liable for the Site. In this regard, Shell submits the affidavit of its attorney, Mary Bittence, who incorporates two 1995 letters to plaintiffs' attorney wherein Bittence states that after researching Shell's involvement, she concluded that material taken to the Site was from independent dealers over which Shell is not responsible and that the evidence submitted to Shell from plaintiffs did not implicate Shell. Also attached is a third 1995 letter enclosing Rule 26 voluntary disclosures. (Shell reply Ex. 1). Finally, a November 1998 letter from Bittence to plaintiffs' attorney attaches affidavits and a summary of deposition testimony purportedly demonstrating that Shell is not liable for waste at the Site.

It does not appear that after having served their notice on Shell (amongst numerous other defendants), and having received no response, plaintiffs have filed a motion to compel this allegedly outstanding discovery. Thus, this contention will not defeat summary judgment.

Finally, plaintiffs argue that in *General Electric, supra,* wherein the Second Circuit determined that an oil company is not liable for the oil waste shipments of its independent dealers, the court examined the lease agreements between the dealers and the oil companies before determining that the oil companies did not contract responsibility for waste disposal of the dealers. Plaintiffs assert that herein Shell has not provided plaintiffs with copies of the applicable leases. Again, Shell asserts that it is not its obligation to disprove the elements of plaintiffs' claim. Nevertheless, in its reply Shell submits the affidavit

of Linda Paul, who is employed by an agency as Supervisor of Contracts and who conducted a review for records of Shell's leases with its independent dealers in Ohio for 1938 to 1990. Paul avers that no records for leases were found before 1974 but she incorporates with her affidavit a copy of a model service station lease used by Shell from 1974 to 1990 for its independent dealers. All the leases she reviewed contained the same or similar paragraph stating that Shell does not reserve the right to control the operations or business of the lessee. (reply Ex. 2). Shell points out that the language of their leases contained nearly identical language to those in *General Electric. Id.* at 283. Therefore, plaintiffs' assertion in this regard lacks merit.

For these reasons, plaintiffs have failed to raise an issue of fact as to the liability for the service stations' disposal of waste.

### (b) the West Third Street Facility

■ Next, Shell argues that there is no evidence that it ever contracted or otherwise arranged for wastes to be transported to and disposed at the Site from the West Third Street Facility identified by plaintiffs. Shell submits the affidavit of R.H. Safranek, Terminal Manager of the plant located at West Third Street in Cleveland, who avers, "No information or documentation was found which would indicate that [Shell's] Distribution Plant on West Third Street in Cleveland, Ohio ever sent any material to Huth Oil Company." (Shell Ex. 4). Shell also asserts that none of the plaintiffs testified that they had any knowledge of waste oil being transported from this facility and disposed at the Site. Shell points to Gordon Stutzman's [6] testimony that he had no recollection of business relationships between the facility and Huth. (Shell Ex. 9 and 10). Another driver for Huth Oil, John Ockenga, also testified that he did not recall any business

between Huth and this facility. (Shell Ex. 8).

Plaintiffs point to portions of an "interview report" of John Ockenga wherein he apparently [7] states that Shell did blending of oils at West 3rd, that waste material picked up "came from off-spec production at West 3rd and oil changes at the gas stations" and there "was contaminated diesel oil and off-spec blends at West 3rd and crank case oil at the gas stations." (pltfs.Ex. A). Plaintiffs also point to the unsigned statement of Carl Stutzman that another driver picked up oil from Shell. (*Id.* at 1034). The Court agrees with Shell that the unauthenticated notes of the investigator's interview do not create an issue of fact. Moreover, Shell points again to Ockenga's deposition testimony that he did not recall any business with this facility. (Shell Ex. 8). And, while Stutzman's unsigned statement expresses that he picked up oil from Shell, his deposition testimony specifically states that he did not recall any pick ups of waste oil by Huth from the West Third Street facility and that he did not recall Huth having received any "off-spec oil" from that facility. (Shell Ex. 10).

Therefore, plaintiffs fail to show that the West Third Street Facility arranged for disposal of waste at the Site.

### (c) the Oil City Facility

■ Finally, Shell contends that it never owned a bulk plant facility in Oil City, Pennsylvania despite plaintiff's allegation that Shell owned this facility and arranged for waste oil from it to be ultimately transported to the Site. Shell submits the affidavit of Robert Dunphy, a Real Estate Consultant for Shell, who avers that he conducted a review of the records and concluded that Shell never owned a bulk plant facility in Oil City, Pennsylvania. (Shell Ex. 5).

---

6. Stutzman was apparently a driver for plaintiffs.

7. It appears that the "interview report" *paraphrases* the interviewee's answers to certain topics posed. (pltfs. Ex. A at 6777).

Plaintiffs point to what it characterizes as "an apparent EPA document" (brief at 9) entitled "Estimated VolumesLaskin Oil[8]" wherein another document is headed "Shell Oil–Oil City Pennsylvania" and states, "Laskin picked up about 2,000 gallons twice a year from 1973–80 from the bulk plant facility." (pltfs. Ex. A at 1646, 2025). Of course, Shell objects to the consideration of such an unauthenticated document. The Court agrees.

### Conclusion

For the foregoing reasons, defendant Atlantic Richfield Company's Motion for Summary Judgment and defendant Shell Oil Company's Motion for Summary Judgment are granted.

IT IS SO ORDERED.

8. Plaintiffs state that Laksin is a supplier of waste oil to Huth.